Karen **DAVIDSON, Debbie Flitman, Eugene Perry, Sylvia Weber** and **American Civil Liberties Union of Rhode Island, Inc., Plaintiffs,**

v.

**CITY OF CRANSTON, RHODE ISLAND, Defendant.**

**No. CA 14–91L.**

United States District Court, D. Rhode Island.

Signed Sept. 8, 2014.

Lynette J. Labinger, Roney & Labinger LLP, Providence, RI, Adam Lioz, Demos,

**326**

Washington, DC, Brenda Wright, Demos, Brighton, MA, Sean J. Young, ACLU, New York, NY, for Plaintiffs.

Christopher M. Rawson, Lovett Schefrin Harnett, Normand G. Benoit, David J. Pellegrino, Partridge, Snow & Hahn LLP, Providence, RI, for Defendant.

### *MEMORANDUM AND DECISION*

RONALD R. LAGUEUX, Senior District Judge.

This matter is before the Court on the motion of Defendant City of Cranston, Rhode Island ("the City"), to dismiss the Complaint against it in its entirety. The Complaint alleges that the municipal ward Redistricting Plan adopted by the City in 2012 violates the Equal Protection clause of the Fourteenth Amendment of the United States Constitution. Plaintiffs Karen Davidson, Debbie Flitman, Eugene Perry and Sylvia Weber are City residents. The American Civil Liberties Union of Rhode Island, Inc. (hereinafter, together with the named plaintiffs, designated as "Plaintiffs"), joins the suit in order to represent its approximately 100 members who reside in the City, and who are, allegedly, adversely affected by the Redistricting Plan. For the reasons explained below, this Court denies Defendant's motion to dismiss.

### *Background*

The 2012 Redistricting Plan is based on population numbers tallied by the United States Census Bureau as part of its decennial census count undertaken in 2010. The United States Census Bureau is required by the Constitution to count every person residing in the United States every ten years, in order that the information may be used to allocate representation to the United States House of Representatives. U.S. Const. art. I, § 2, cl. 3. The Census Bureau undertakes to count each person according to their 'usual residence,' and has historically counted prisoners as residents of the district where their prison is located. In 2010, the Census Bureau counted the 3,433 prisoners incarcerated in Rhode Island's only state prison complex, the Adult Correctional Institutions ("ACI"), as residents of Cranston. When the City drew its ward boundaries for the 2012 Redistricting Plan, the entire prison population was situated within one ward.

Each of Cranston's six wards elects one representative to the City Council. An additional three city councilors are elected at-large. The City's school committee is made up of seven members—one from each ward and one at-large. According to Plaintiffs, each city ward has approximately 13,000–14,000 residents.

According to Plaintiffs, the 3,433 prisoners housed at the ACI, and included as part of the population of Ward Six, cannot vote in the ward. Indeed, Rhode Island's Constitution provides that no one who has been convicted of a felony may vote until his or her sentence is completed. R.I. Const. Art. II, § 1. Those prisoners who are able to vote, who are at the ACI for reasons other than a felony conviction, are required to vote by absentee ballot at their pre-incarceration domicile—considered by State statute to be their "residence for voting purposes." R.I. Gen. Laws § 17–1–3.1(a)(2).[1]

---

1. R.I.G.L. § 17–1–3.1 provides in pertinent part:
 (a) A person's residence for voting purposes is his or her fixed and established domicile.... A person can have only one domicile, and the domicile shall not be considered lost solely by reason of absence for any of the following reasons:
 ...
 (2) Confinement in a correctional facility; ...

According to Plaintiffs, "the overwhelming majority" of prisoners are not residents of Cranston, let alone its Ward Six. Assuming this to be true, as the Court must on a motion to dismiss, the number of prisoners who are able to vote in Ward Six likely is negligible. Moreover, Plaintiffs allege, in addition to not voting in Ward Six, the prison population is unable to participate in, benefit from or contribute to any other aspect of civic life in Cranston.

According to Plaintiffs' calculations, the prison population makes up 25% of the total population of Ward Six. As a result, the voting power of the remaining 75% of the Ward's residents[2] is strengthened; while at the same time, the voting power of residents of the other five wards is diluted. Plaintiffs assert in the Complaint, "[E]very three actual residents of that ward [Six] have as much say about city and school affairs as four residents in any other ward." According to the City, the population deviations amongst the wards is around 5%. However, according to Plaintiffs, if the prison population were subtracted from the count, the deviation is over 28%.

Plaintiffs assert that they attended City Council meetings during the redistricting process to object to the inclusion of the ACI population in Ward Six. Nonetheless, the City ultimately adopted the plan, causing Plaintiffs ongoing and irreparable harm. Plaintiffs claim one cause of action, for violation of section 1 of the Fourteenth Amendment of the Constitution. They seek a declaration that the 2012 Redistricting Plan is unconstitutional and seek to enjoin further elections in Cranston until a constitutionally-acceptable plan is developed.

### Standard of Review

Defendant moves to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief may be granted. In considering a Rule 12(b)(6) motion, a court must accept as true all allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996). The United States Supreme Court has recently stated the standard as follows: "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court further refined its requirements in *Ashcroft v. Iqbal:*

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.

556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citations omitted).

### Analysis

### The right to vote, be counted and be represented

The United States Supreme Court has consistently recognized that the right to vote and to have one's vote counted is a fundamental tenet of our democracy. In

---

2. The remaining residents in Ward Six number 10,209. Complaint ¶ 21.

*Wesberry v. Sanders,* a case involving allegations of racial gerrymandering in Georgia's congressional districts, the Court wrote:

No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.

376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). *Wesberry* held that inherent in the right to vote was the right to have that vote counted, meaning "that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Id.* at 7–8, 84 S.Ct. 526. The Court extended this notion of 'one man, one vote' to state legislative bodies in *Reynolds v. Sims,* an Alabama racial gerrymandering case:

[I]f a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted.... The resulting discrimination against those individual votes living in disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State. Two, five, or 10 of them must vote before the effect of their voting is equivalent to that of their favored neighbor.

377 U.S. 533, 562–63, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Correlated to the right to vote is the right of a citizen to petition his or her elected official, which right of access is similarly diluted if the official represents more people than the official in the neighboring district represents. U.S. Const. amend. I; *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

To avoid vote dilution, the Supreme Court in *Reynolds v. Sims* mandated that state legislative voting districts be based on population:

We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State.

377 U.S. at 568, 84 S.Ct. 1362. The Court went on to require that "a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Id.* at 577, 84 S.Ct. 1362.

While *Wesberry* required strict population equality in congressional voting districts, 376 U.S. at 8–9, 84 S.Ct. 526, the *Reynolds* Court allowed that States might be permitted some leeway in their legislative districts, in order to allow for other possible legitimate considerations, such as existing political subdivisions. 377 U.S. at 578, 84 S.Ct. 1362. The *Reynolds* Court left the crafting of this standard to the lower courts, as long as its primary directive was followed:

Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.

*Id.* at 579, 84 S.Ct. 1362. By 1983, the Supreme Court was willing to tolerate voting districts with significantly disparate populations for Wyoming's state legislature in *Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983). While districting plans which allocated disproportionately more representation to less-populated rural areas in comparison with higher-populated urban areas were found to have racially-discriminatory intent in the Southern states in the civil-rights-era cases, this kind of arrangement met with Supreme Court approval in *Brown,* because allowing each county to have its own representative, regardless of population, was deemed a rational state policy. *Id.* at 848, 103 S.Ct. 2690. The Court also stressed that Wyoming's plan was applied neutrally and consistently, and had no taint of discriminatory intent. *Id.* at 846, 103 S.Ct. 2690.

In *Avery v. Midland County, Texas,* 390 U.S. 474, 484–85, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), the Supreme Court extended its holding in *Reynolds v. Sims* to intrastate districting. ("We hold today only that the Constitution permits no substantial variation from equal population in drawing districts for units of local government having general governmental powers over the entire geographic area served by the body.")

The Supreme Court's jurisprudence in the area of voting rights embodies, and frequently merges, two distinct concepts. First is the idea represented by the oft-repeated phrase: "One Man, One Vote." The Supreme Court could not be more adamant about the importance of each voter's vote carrying the same weight as his neighbor's vote:

> The personal right to vote is a value in itself, and a citizen is, without more and without mathematically calculating his power to determine the outcome of an election, shortchanged if he may vote for

only one representative when citizens in a neighboring district, of equal population, vote for two; or to put it another way, if he may vote for one representative and the voters in another district half the size also elect one representative.

*Board of Estimate of City of New York v. Morris,* 489 U.S. 688, 698, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989). The second requirement clearly articulated by the Supreme Court is that the first goal should be achieved by drawing political boundaries in such a way so as to achieve districts with equal populations, as precisely as is practicable:

> Therefore, the command of Art. I § 2, that States create congressional districts which provide equal representation for equal numbers of people permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown.

*Kirkpatrick v. Preisler,* 394 U.S. 526, 531, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). The subject of extensive litigation since the landmark voting rights cases of the 1960s has been the murky area where population parity fails to achieve the goal of voting equality.

### *The rights of non-voters*

In every voting district, there are residents who can't vote. In the past, this group included women and slaves. Currently, the group includes, *inter alia,* children, non-citizens and prisoners. In addition, there are groups who can vote but may choose to vote in other districts, such as college students, members of the military assigned to temporary bases, and federal employees at federal installations. All of these groups have been the subject of federal voting rights litigation. *See Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979,

35 L.Ed.2d 320 (1973) (personnel "home-ported" at the U.S. Naval Station in Virginia); *Evans v. Cornman,* 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970) (federal employees living at the National Institute of Health in Maryland); *Kirkpatrick,* 394 U.S. at 530, 89 S.Ct. 1225 ("military personnel, college students, and other nonvoters"); *Chen v. City of Houston,* 206 F.3d 502 (5th Cir.2000) (noncitizens and minors); *Fletcher v. Lamone,* 831 F.Supp.2d 887 (D.Md.2011) (prisoners) *aff'd* —— U.S. ——, 133 S.Ct. 29, 183 L.Ed.2d 671 (2012); *Perez v. Texas,* 2011 WL 9160142 (W.D.Tex.) (prisoners in a context of claims of racial gerrymandering); *Travis v. King,* 552 F.Supp. 554 (D.Haw.1982) (military personnel). Frequently, the Supreme Court implicitly assumes that districts with equal populations will include an even distribution of members of non-voting groups, with the result being a neat coincidence of voter and population equality. However, this assumption does not prove to be consistently reliable.

### The suitability of Census figures

The Supreme Court has recognized the shortcomings of relying on Census figures to establish intrastate voting districts, and has never held that reliance on Census figures is constitutionally required. *Mahan,* 410 U.S. at 331, 93 S.Ct. 979; *Burns v. Richardson,* 384 U.S. 73, 91, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). For one thing, while States and municipalities rely on U.S. Census figures to draw intrastate districts, the federal enumeration is undertaken specifically to allocate seats in the United States Congress. The Supreme Court has noted that the political disproportion that may be caused by counting non-voting residents, which tends to be more evenly distributed in large districts, is magnified in smaller districts. *Karcher v. Daggett,* 462 U.S. 725, 737, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). Consequent-

ly, the Supreme Court has approved efforts to adjust Census figures to achieve districts with greater voting parity, as long as those efforts are employed consistently. *Kirkpatrick,* 394 U.S. at 535, 89 S.Ct. 1225; *Burns,* 384 U.S. at 92, 86 S.Ct. 1286 ("Neither in *Reynolds v. Sims* nor in any other decision has this Court suggested that the States are required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of a crime in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured."); *Fletcher,* 831 F.Supp.2d 887 (approving Maryland's law that required state and federal prisoners to be counted at their pre-incarceration domiciles for purposes of generating local, state and federal legislative districts).

### Equal representation

When Census-driven voter disproportion is tolerated, it is justified by the notion of providing "equal representation for equal numbers of people"—a notion inherent and implicit in the Supreme Court's insistence on districts of strict population equality, and embodied in the Constitution's "right to petition" clause. *Kirkpatrick,* 394 U.S. at 531, 89 S.Ct. 1225. The Ninth Circuit addressed the importance of representational equality in *Garza v. County of Los Angeles:*

> The framers were aware that this apportionment and representation base would include categories of persons who were ineligible to vote—women, children, bound servants, convicts, the insane, and, at a later time, aliens. Nevertheless, they declared that government should represent *all* the people. In applying this principle, the *Reynolds* Court recognized that the people, including those who are ineligible to vote, form the basis for representative government.

Thus population is an appropriate basis for state legislative appointment.

918 F.2d 763, 774 (9th Cir.1990) (citations omitted)(emphasis in original). The Supreme Court has consistently recognized the rights of noncitizens, minors and other similar groups to express themselves politically and otherwise participate in civic life. *See Nyquist v. Mauclet*, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977); *Tinker v. Des Moines Independent Com. Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

In a noteworthy concurrence and dissent in *Garza v. County of Los Angeles,* Circuit Judge Alex Kozinski elucidated the distinction between 'electoral equality' and 'representational equality'—a distinction frequently elided by the Supreme Court.

> How does one choose between these two apparently conflicting principles? It seems to me that reliance on verbal formulations is not enough; we must try to distill the theory underlying the principle of one person one vote and, on the basis of that theory, select the philosophy embodied in the fourteenth amendment. Coming up with the correct theory is made no easier by the fact that the Court has been less than consistent in its choice of language...

918 F.2d at 781. Following an extensive parsing of the Supreme Court's dictates in the area of voting rights, Judge Kozinski concluded that electoral equality is the paramount goal of the Constitution, writing: "It is very difficult in my view, to read the Supreme Court's pronouncements in this area without concluding that what lies at the core of one person one vote is the principle of electoral equality, not that of equality of representation." *Id.* at 782.

### Cranston's prison population

 While Judge Kozinski's concurrence is clarifying and compelling, the case now before this Court presents an alleged set of circumstances that appears to be justified by neither the principle of electoral equality nor of representational equality. Clearly, the inclusion of the ACI prison population is not advancing the principle of electoral equality because the majority of prisoners, pursuant to the State's Constitution, cannot vote, and those who can vote are required by State law to vote by absentee ballot from their pre-incarceration address. Consequently, according to Plaintiffs, a full 25% of the population of Ward Six cannot vote in the Ward. The Fifth Circuit has indicated that, in its view, this kind of arrangement may not be constitutionally acceptable:

> ... [G]enerally, the ineligible to vote or to register to do so (whether felons, minors, or noncitizens) can be assumed to be evenly distributed throughout the area to be districted, and the usage of total population is thus an acceptable surrogate for measuring potential voters. When, however, a districting body *knows* that large numbers of those ineligible to vote are disproportionately concentrated in certain areas, it can no longer in good faith use total population as a proxy for potential voters. Instead, it is obligated to deploy a more sophisticated measurement...

*Chen v. City of Houston,* 206 F.3d at 524 (emphasis added).

Furthermore, if Plaintiffs' allegations are true, the prisoners' inclusion in Ward Six does nothing to advance the principle of representational equality. Nonvoting residents generally have a right to petition elected officials, even if they were not able to vote for them; and they may generally be presumed to have a great interest in the management of their municipalities. This is true of minors, noncitizens, college students, and military and naval personnel. The Supreme Court pointed this out in

discussing the inclusion of National Institute of Health personnel living in a federal enclave in Maryland:

> Thus, if elected representatives enact new state criminal laws or sanctions or make changes in those presently in effect, the changes apply equally to persons on NIH grounds.... Further, appellees are as concerned with state spending and taxing decisions as other Maryland residents, for Congress has permitted the States to levy and collect their income, gasoline, sales, and use taxes—the major sources of state revenues—on federal enclaves. State unemployment laws and workmen's compensation laws likewise apply to persons who live and work in federal areas. Appellees are required to register their automobiles in Maryland and obtain drivers' permits and license plates from the State; they are subject to the process and jurisdiction of state courts; they themselves can resort to those courts in divorce and child adoption proceedings; and they send their children to Maryland public schools.

*Evans v. Cornman,* 398 U.S. at 424, 90 S.Ct. 1752.

But does any of this apply to prisoners at the ACI? Based on Plaintiffs' allegations, it appears to the Court that the ACI population does not participate in any aspect of the City's civic life. According to Plaintiffs, they cannot send their children to school in Cranston; they cannot visit the City's parks; they do not pay taxes to the City; they do not drive on the City's roads. It is not clear from the information available to the Court at this juncture of the litigation that the prisoners at the ACI's inclusion in Ward Six furthers the Constitutional goals of either representational or electoral equality. Consequently, because the Court cannot say that the City's 2012 Redistricting Plan is constitutional as a matter of law, Defendant's Motion to Dismiss the Complaint is denied.

### Conclusion

For the reasons explained above, Defendant's Motion to Dismiss the Complaint hereby is denied. In due time and after consultation with counsel, the Court will issue a pretrial scheduling order to bring this matter to a bench trial where the precise facts can be determined. In the meantime, the status quo in this matter will be maintained.