The FUND FOR ACCURATE AND INFORMED REPRESENTATION, INC., Juan De Sanctis, Augustine C. Chen, Onel Alfraro, Margaret Quigley, Helen K. Horn, Calvin L. Walton, Juan L. Jimenez, Felix Figueroa, Alfred Hong, Emory N. Jackson and Juan De La Cruz, Brooklyn Political Action Committee, Inc., Martin Chicon, Ronald Travis, Martha Howlette, Louis Deguzman, Marion Phillips, Bay Ridge Community Council, Inc., and George K. Arthur, Plaintiffs,

v.

Saul WEPRIN, both Individually and as Speaker of the Assembly of the State of New York, David Gantt, both Individually and as Co–Chairman of the Legislative Task Force on Demographic Research and Reapportionment, Dean Skelos, both Individually and as Co–Chairman of the Legislative Task Force on Demographic Research and Reapportionment, Mario Cuomo, both Individually and as Governor of the State of New York, Stanley Lundine, both Individually and as Lt. Governor of the State of New York and as presiding Officer and President of the Senate of the State of New York, the New York State Legislative Task Force on Demographic Research and Reapportionment, the Senate of the State of New York, the Assembly of the State of New York, and the Board of Elections of New York State, Defendants.

Clarence E. NORMAN, Jr., Angelo Del Toro, David F. Gantt, the New York State Assembly and Saul Weprin, Plaintiffs,

v.

Mario M. CUOMO, Stan Lundine, Ralph J. Marino, the New York State Senate, the State Board of Elections, Clarence D. Rappleyea, John Faso, the Fund For Accurate and Informed Representation, Inc., Juan De Sanctis, Augustine C. Chen, Onel Alfari, Aurelia Greene, James F. Brennan, Anthony S. Seminerio and Frederick D. Schmidt, Defendants.

George P. SCARINGE, Plaintiff,

v.

Ralph J. MARINO, Majority Leader of the Senate of the State of New York; Dean Skelos, Co–Chairman of the New York State Legislative Task Force on Demographic Research and Reapportionment; the Senate of the State of

New York; Saul Weprin, Speaker of the Assembly of the State of New York; David Gantt, Co–Chairman of the New York State Legislative Task Force on Demographic Research and Reapportionment; the Assembly of the State of New York; Mario Cuomo, Governor of the State of New York; Stanley Lundine, Lieutenant Governor of the State of New York; and the Board of Elections of the State of New York, Defendants,

Anthony Masiello and Manfred Ohrenstein, Intervenors–Defendants.

United States District Court, N.D. New York.

Aug. 19, 1992.

Tabner, Laudato Law Firm, Albany, N.Y. (William F. Ryan, Jr. and John W. Tabner, of counsel), Baker, Hostetler Law Firm, Washington, D.C. (E. Mark Braden, of counsel), Edward L. Howlette & Associates, P.C., Amityville, N.Y. (Edward L. Howlette, of counsel), Andrew L. Sichenze, Brooklyn, N.Y., for plaintiffs.

Graubard, Mollen Law Firm, New York City (C. Daniel Chill, Elaine M. Reich, of counsel), DeGraff, Foy, Holt–Harris & Mealey, Albany (Carroll J. Mealey, of counsel), for defendants Saul Weprin, David Gantt, Task Force and the NYS Assembly.

Shaw, Pittman Law Firm, Washington, D.C. (Michael A. Carvin, William L. McGrath, Charles J. Cooper, of counsel), for defendants Dean Skelos and the NYS Senate.

Robert Abrams, Atty. Gen., Albany, N.Y. (Donald P. Berens, Jr., Asst. Atty. Gen., of counsel), for defendants Mario Cuomo, Stanley Lundine and Bd. of Elections.

Cusick & Hacker, Latham, N.Y. (Roger J. Cusick, of counsel), for plaintiff Scaringe.

Duker & Barrett, Albany, N.Y. (George F. Carpinello, of counsel), for intervenors-defendants.

Before CARDAMONE, Circuit Judge, McCURN, Chief District Judge, and MUNSON, Senior District Judge.

## AMENDED MEMORANDUM AND ORDER OF THREE–JUDGE COURT
(Amending Memorandum and Order filed July 2, 1992)

PER CURIAM:

We have before us actions that challenge the redistricting apportionment plan for the

New York State Assembly recently enacted by the Legislature. Also before the Court is a challenge to the 1983 Assembly and Senate apportionment plans. After holding a summary trial testing the validity of the state's 1992 Assembly plan on the issues of one person, one vote, partisan gerrymandering and racial gerrymandering, we find the reapportionment plan meets constitutional and statutory Voting Rights Act requirements on each of these issues. There remain nonetheless two assembly districts in Manhattan that the Attorney General of the United States found racially malapportioned.

■ It is abundantly clear that legislative reapportionment is a matter primarily for a state's legislative body, and that a federal court may interfere only when that body fails timely to validly reapportion, after having had an adequate opportunity to do so. This is such a case. As of this date, July 2, 1992—one week from the commencement of the state's election process—the legislature has not yet enacted a valid redistricting plan pre-cleared by the United States Department of Justice, with respect to both the Assembly and the Senate. As discussed more fully below, the Senate plan is invalid by operation of Article 3, Section 5 of the New York State Constitution. We must therefore maintain jurisdiction to ensure that the election process in New York may commence in a timely, constitutional and statutorily valid manner.

### BACKGROUND

The present three-judge court was convened by the Chief Judge of the United States Court of Appeals for the Second Circuit to hear and determine the issues raised in three actions involving the reapportionment of the State of New York based on the 1990 Census. *See Fund for Accurate and Informed Representation, Inc., et al. v. Weprin, et al.,* No. 92–CV–283 (N.D.N.Y.) ("the *FAIR* action") (challenge to the apportionment of Assembly seats in 1992 N.Y.Laws chs. 76–78); *Norman, et al. v. Cuomo, et al.,* No. 92–CV–720 (N.D.N.Y.) ("the *Norman* action") (declaration that the 1992 Assembly plan is statutorily and constitutionally valid); *Scaringe v. Marino, et al.,* No. 92–CV–593 (N.D.N.Y.) ("the *Scaringe* action") (challenge to the existing 1983 apportionment of both the Senate and the Assembly). By per curiam order dated June 15, 1992, the three-judge court consolidated the *FAIR* action and the *Norman* action. For ease of reference, the court shall group the parties as specified below and refer primarily to the *FAIR* complaint unless further differentiation is required.

Parties contesting the 1992 Assembly plan are the Fund for Accurate and Informed Representation, Inc. ("FAIR"), which is a New York not-for-profit corporation, and a variety of other corporate and individual plaintiffs (collectively "plaintiffs"). Parties defending the 1992 plan are the New York State Assembly, its Speaker, the Legislative Task Force on Demographic Research and Reapportionment and one of its Co–Chairmen, who is also a member of the Assembly ("Assembly defendants"), the Senate of the State of New York and a member who is Co–Chairman of the Legislative Task Force ("Senate defendants"), the Governor and Lt. Governor of the State of New York, and the Board of Elections of New York State ("Executive defendants").

The FAIR complaint alleges three causes of action. The first contains four claims: (1) the Assembly is not presently apportioned—nor is the 1992 reapportionment plan—consistent with the required principle of "one person, one vote"; (2) the newly enacted Assembly reapportionment plan comprises a partisan gerrymander which discriminates against citizens who support the Republican Party; (3) the new plan violates the Equal Protection Clause of the Fourteenth Amendment, the Federal Civil Rights Act and the Voting Rights Act of 1965 by diluting minority voting rights and interests; and (4) the new plan violates the Equal Protection Clause of the Fourteenth Amendment by "fragmenting cohesive communities of interest and political subdivisions between Assembly districts." The second and third causes of action assert that defendants' failure to adopt a constitu-

tional reapportionment plan for the Assembly districts in a timely manner prior to the commencement of the 1992 electoral process irreparably harms the plaintiffs and violates the constitutional rights of minority candidates. While plaintiff in the *Scaringe* action does not challenge the 1992 redistricting plan, he does challenge the continued validity of the 1983 districts in view of the 1990 Census. Plaintiff Scaringe seeks to enjoin defendants from conducting the 1992 elections using the malapportioned 1983 districts. The ultimate relief requested by plaintiffs in these actions is for the court to adopt a constitutionally and statutorily valid redistricting plan in time for the 1992 electoral process scheduled to commence on July 9, 1992.

A barrage of pre-trial motions were addressed by the court prior to the summary trial held in Utica, New York on June 24–25, 1992. Of particular importance here are four pre-trial matters. The court, acknowledging that only when state agencies cannot act expeditiously in light of the state's election calendar should a federal court step in to review the validity of the state's redistricting plan, declined defendants' repeated requests to abstain in these cases. *E.g.*, Per Curiam Order dated May 28, 1992, at 7–8, *citing White v. Weiser*, 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973); *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975). In the same per curiam order, the second and third causes of action were dismissed on the ground that they were not ripe for adjudication, thus leaving only the first cause of action for trial. After two state courts in parallel actions declared the 1992 redistricting plan unconstitutional under the New York State Constitution,[1] leaving the state with no valid plan in effect on

the eve of the election schedule, this court proceeded by per curiam order dated June 19, 1992 to appoint pursuant to Fed. R.Civ.P. 53 a special master to apportion the Senate and Assembly districts for the 1992 elections. Prior to the taking of proof at the summary trial on June 24, 1992, the court entertained a motion for partial summary judgment in the *Scaringe* action on the limited issue of the validity of the 1983 Senate and Assembly districts in view of the 1990 Census. All parties having agreed that the 1983 districts are no longer apportioned in accordance with constitutional and statutory requirements, the court granted plaintiff Scaringe's motion for summary judgment on this limited issue and enjoined defendants from conducting the 1992 elections using the malapportioned 1983 districts. *See* Final Pre-Trial Order, dated June 24, 1992, 796 F.Supp. 468 (D.Kan.) (per curiam).

While the summary trial was in progress, on June 25, 1992 the Attorney General of the United States found that two Assembly districts in the northern part of Manhattan violated the Voting Rights Act of 1965. He precleared the remainder of the Assembly districts and all of the Senate districts in the Bronx, Brooklyn, and Manhattan. This court proceeded with the taking of proof, cognizant of the fact that the state had no valid redistricting plan in place based on both the Attorney General's decision and the New York Supreme Court decisions in *Wolpoff* and *Dixon*.

On June 30, 1992, the New York Court of Appeals reversed the lower courts' decisions in *Wolpoff* and *Dixon*, declaring that the 1992 Senate districts represent a balancing of state and federal requirements and that the districts comply with the New

---

1. On June 12, 1992, Justice Saks of the New York Supreme Court, Bronx County, delivered a bench decision in *Wolpoff, et al. v. Cuomo, et al.*, Index No. 14757–92, ruling that the 1992 Senate redistricting plan contained in 1992 N.Y.Laws chs. 76–78 was violative of Article III, section 4 of the New York State Constitution. The court further ruled that the 1992 Assembly redistricting plan must also be invalidated based on the mandate in Article III, section 5 of the state constitution that the Senate and Assembly must be redistricted by the same law. On June

15, 1992, Justice DeGrasse of the New York Supreme Court, New York County, issued a Decision and Order in *Dixon, et al. v. Cuomo, et al.*, Index No. 13266–92, ruling that the 1992 Senate redistricting plan contained in 1992 N.Y.Laws chs. 76–78 was violative of Article I, section 11 and Article III, section 4 of the New York State Constitution. Justice DeGrasse did not address the 1992 Assembly plan. Both state court decisions were appealed to the New York Court of Appeals.

York State Constitution as far as is practicable. We turn now to the issues raised at trial.

## DISCUSSION

### I

We first review plaintiffs' contention that the 1992 Assembly plan violates the "one person, one vote" principle first articulated in *Gray v. Sanders,* 372 U.S. 368, 379, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963), which is grounded in the equal protection clause of the Fourteenth Amendment. This principle prevents states from diluting an individual's right to vote and to receive equal representation, which can occur when one is placed in a heavily populated legislative district relative to other state districts. *See Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 *reh'g denied,* 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964). To prevent vote dilution, states must "make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable." *Id.* 377 U.S. at 577, 84 S.Ct. at 1390.

■ Absolute equality in population is not required when to do so ignores state policy concerns that might justify minor deviations in population between legislative districts. *See Gaffney v. Cummings,* 412 U.S. 735, 748–49, 93 S.Ct. 2321, 2329, 37 L.Ed.2d 298 (1973); *accord, e.g., Connor v. Finch,* 431 U.S. 407, 418, 97 S.Ct. 1828, 1835, 52 L.Ed.2d 465 (1977).

■ Minor deviations from absolute equality among districts are presumptively valid. A "minor" deviation is defined as a deviation of less than 10 percent. *See Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2695, 77 L.Ed.2d 214 (1983). A plan that creates a maximum population deviation in excess of 10 percent constitutes a *prima facie* case of discrimination that must be justified by the state; otherwise the apportionment plan that caused the deviation is invalid. *Id.* at 842–43, 103 S.Ct. at 2696.

■ Turning to the present case, we look first to the maximum population deviation of the Assembly plan to determine whether it satisfies the 10 percent threshold for establishing a *prima facie* case of discrimination. A cursory examination reveals that the proof fails to establish a *prima facie* case. Plaintiffs' submissions to the Court are replete with concessions that the maximum population deviation in the Assembly plan is 9.43 percent, for example, in their trial brief of June 17, 1992 and their June 24, 1992 answers to the Special Master's questions. This concession is fatal to the one person, one vote claim because, absent credible evidence that the maximum deviation exceeds 10 percent, plaintiffs fail to establish a *prima facie* case of discrimination under that principle sufficient to warrant further analysis by this Court. *See Brown,* 462 U.S. at 842, 103 S.Ct. at 2695.

■ Moreover, we reject plaintiffs' contention that the state must justify an apportionment plan even though it creates a maximum deviation of under 10 percent. While plaintiffs' argument may be correct in the context of state apportionment of Congressional districts, *see Karcher v. Daggett,* 462 U.S. 725, 734, 103 S.Ct. 2653, 2660, 77 L.Ed.2d 133 (1983) (when apportioning Congressional districts, state must justify even *de minimis* deviations from absolute equality), it has no application to apportionment of state legislative districts. "[M]inor deviations from mathematical equality among *state legislative districts* are *insufficient to make out a prima facie case* of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Gaffney,* 412 U.S. at 745, 93 S.Ct. at 2327 (emphasis added), *quoted in Brown,* 462 U.S. at 842, 103 S.Ct. at 2695. Accordingly, we find no violation of the one person, one vote principle.

### II

■ We turn next to plaintiffs' allegation of political gerrymandering, a claim which also arises under the equal protection clause. To prevail on this argument, plaintiffs must prove that "the electoral system is arranged in a manner that will

consistently degrade a voter's or a group of voters' influence on the political process as a whole." *Davis v. Bandemer,* 478 U.S. 109, 132, 106 S.Ct. 2797, 2810, 92 L.Ed.2d 85 (1986) (plurality). In *Bandemer,* the Supreme Court did not indicate that political gerrymandering claims may arise from a gerrymander of one house of a bicameral legislature. To the contrary, the Court instructed that "the inquiry centers on the voters' direct or indirect influence on the elections of the state legislature *as a whole,*" so that an equal protection violation may be found only when "the electoral system substantially disadvantages certain voters in their opportunity to influence the political process effectively." *Id.* at 133, 106 S.Ct. at 2810 (emphasis added).

Plaintiffs allege that the Assembly apportionment plan denies Republicans their right to fair and effective representation. Plaintiffs' evidence, even when considered in its most persuasive light, falls short of proving that the Assembly apportionment plan deprives Republicans of an opportunity to "influence [New York State's] political process as a whole." *Id.* at 132, 106 S.Ct. at 2810. The fatal flaw in plaintiffs' case is the simple fact that the New York State Senate is an integral component of the state's legislature, and that Republicans hold a majority of the Senate seats. It may not sensibly be denied that a political party controlling the Senate is able to influence legislation. After all, no legislation becomes law without the approval of the Senate. Thus, a party that plays an active role in the Senate therefore plays an active role in the state political process. These undeniable facts are critical when a political party claiming to be gerrymandered out of the state's political process must show that it has been shut-out of the process "as a whole." *Bandemer,* 478 U.S. at 132, 106 S.Ct. at 2810.

The inevitable conclusion from the foregoing discussion is that a political party which is precluded from one house of a bicameral legislature is not necessarily foreclosed from the state's political process as a whole. Under *Bandemer,* plaintiffs cannot prevail on their political gerrymandering claim *vis-a-vis* the Assembly appor-

tionment plan without showing that the gerrymandering contaminated the Senatorial apportionment as well. Plaintiffs failed to present any evidence suggesting that defendants' gerrymandering contaminated the Senate apportionment plan. In fact, the evidence shows that the Assembly apportionment plan was a result of a political compromise that allowed the Republicans to craft the Senate apportionment plan while the Democrats fashioned the Assembly plan. It is difficult to fathom how plaintiffs can argue that the Assembly plan will consistently degrade Republicans' ability to influence New York's political process. *See also Badham v. March Fong Eu,* 694 F.Supp. 664, 670–71 (N.D.Cal.1988) (three-judge court) (the absence of "strong indicia of lack of political power" for California Republicans fatal to partisan gerrymandering claim), *aff'd,* 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989). Thus, the evidence fails to support defendants' claim of political gerrymandering.

### III

#### A.

■ In their third amended complaint plaintiffs raise three separate claims alleging unlawful diminution of voting rights, political power and influence for racial and language minorities through the reapportionment of the State Assembly. They contend the new plan violates the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment's protection against abridgement of the right to vote on account of race. The Equal Protection Clause of the Fourteenth Amendment guarantees the opportunity for equal participation by all voters, and redistricting plans that do not achieve fair and effective representation for all citizens impair basic constitutional rights secured by this Amendment. *See Reynolds,* 377 U.S. at 566, 84 S.Ct. at 1384. Plaintiffs also assert the Assembly plan effects a racial gerrymander in violation of the Voting Rights Act of 1965, 42 U.S.C. § 1973(a), (b) (1988).

■ We examine first plaintiffs' constitutional claims that the Assembly plan dis-

criminates on the basis of race. Plaintiffs conceded at trial that defendants harbored no design or purpose to discriminate against minorities in reapportioning the Assembly. Instead, they claim minority vote dilution was caused by defendant's partisan gerrymandering efforts. In light of plaintiffs' concession, the Fourteenth and Fifteenth Amendment claims must fail. It is well settled that constitutional claims of the kind alleged here require proof that the apportionment plan be "conceived or operated as [a] *purposeful* devic[e] to further racial discrimination." *Whitcomb v. Chavis,* 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971) (emphasis added). Without a racially discriminatory aim, *see Mobile v. Bolden,* 446 U.S. 55, 62, 100 S.Ct. 1490, 1497, 64 L.Ed.2d 47 (1980), the purposeful discrimination required under the Constitution cannot be shown. *See, e.g., Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Wright v. Rockefeller,* 376 U.S. 52, 56, 58, 84 S.Ct. 603, 605, 606, 11 L.Ed.2d 512 (1964); *Gomillion v. Lightfoot,* 364 U.S. 339, 341, 347, 81 S.Ct. 125, 127, 130, 5 L.Ed.2d 110 (1960).

Plaintiffs point to decisions by other courts where a racially discriminatory motive was inferred from "an ultimate objective of keeping certain white incumbents in office...." *Ketchum v. Byrne,* 740 F.2d 1398, 1408 (7th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). *See also Garza v. County of Los Angeles,* 918 F.2d 763, 771 (9th Cir. 1990) (splitting of minority communities was the means chosen by the legislature for achieving preservation of incumbency), *cert. denied,* —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991); *Armour v. Ohio,* 775 F.Supp. 1044, 1060–61 (N.D.Ohio 1991). But plaintiffs failed to demonstrate any linkage between the alleged fragmentation of minority communities in Monroe, Nassau, Erie or Westchester Counties, and an alleged intent to preserve the incumbency of "certain white incumbents." Without that correlation, intentional discrimination cannot be inferred.

In fact, in Assembly Districts 18, 133 and 141, (Nassau, Monroe and Erie), where the fragmentation of minority communities is alleged by plaintiffs—though to which communities plaintiffs refer is not clear from the pleading—a black incumbent presently holds office, and in A.D. 84 in Westchester County there is no resident incumbent. And examining areas with substantial minority communities elsewhere in the state, such as in Buffalo, the Capitol District, Syracuse, Staten Island and Suffolk County, we find apportionment that appears to consolidate minority populations—possibly in the interests of maximizing minority influence—rather than discriminatory fragmentation. Hence, no racial gerrymandering under the Fourteenth and Fifteenth Amendments has been found to exist.

### B.

In addition to satisfying constitutional requirements, redistricting plans must comply with the Voting Rights Act of 1965, as amended in 1970, 1975, and 1982 (42 U.S.C. § 1973 *et seq.*) (Act). The Act is intended to facilitate implementation of the Fifteenth Amendment—to protect citizens from the denial or abridgement of the right to vote based on race or color. *See National Assoc. for the Advancement of Colored People v. New York,* 413 U.S. 345, 350, 93 S.Ct. 2591, 2595, 37 L.Ed.2d 648 (1973); *South Carolina v. Katzenbach,* 383 U.S. 301, 315, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966) (primary purpose of the Act is "to rid the country of racial discrimination in voting" (footnote omitted)).

The Act prohibits the enforcement of any voting "practice, or procedure ... [that] results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," (42 U.S.C. § 1973(a)), or "because he is a member of a language minority group." 42 U.S.C. § 1973b(f)(2). In *Allen v. State Board of Elections,* 393 U.S. 544, 567, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969), the Supreme Court held that the Act should be interpreted in a manner that provides "the

broadest possible scope" for eliminating racial discrimination.

Section 2 of the Voting Rights Act is divided into two subsections. Subsection 2(a) prohibits any voting procedure that "results in a denial or abridgement of" the voting rights of a person on account of race, color, or membership in a language minority. 42 U.S.C. § 1973(a). Subsection 2(b) provides that a violation of subsection 2(a) is established by a showing that "based on the totality of circumstances," members of a class protected under subsection 2(a) "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." § 1973(b).

The leading case construing section 2 of the Act is *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Applying the 1982 Amendments to § 2 of the Act, the Supreme Court utilized a "totality of the circumstances" test to hold that "a court must assess the *impact* of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors'." *Id.* at 44, 106 S.Ct. at 2763 (quoting S.Rep. No. 97–417, 97th Cong., 2d Sess. at 27, *reprinted in* 1982 U.S.C.C.A.N. 177, 205 ("Senate Report")) (emphasis added). A non-exhaustive list of the "circumstances" relevant to our inquiry is set forth in the Senate Report at 28–29, 1982 U.S.C.C.A.N. pp. 205–207. A violation exists when the political process and opportunities to elect representatives of their choice are not equally accessible to members of a protected group and other members of the electorate. *Chisom v. Roemer*, — U.S. ——, 111 S.Ct. 2354, 2365, 115 L.Ed.2d 348 (1991).

The standard § 2 challenge is an assertion of minority vote dilution. Minority vote dilution can occur in one of two ways: by fragmenting large concentrations of minority populations and dispersing them into separate electorate districts, or by concentrating minorities into districts where they constitute an excessive majority. *Thornburg*, 478 U.S. at 46 n. 11, 106 S.Ct. at 2764 n. 11. Hence, in order to not dilute the voting strength of minority groups, redistricting lines should be drawn that neither "dispers[e] [minorities] into districts in which they constitute an ineffective minority of voters" (often referred to as "fragmenting" districts), nor "concentrat[e] [minorities] into districts where they constitute an excessive majority" (often referred to as "packing" districts). *Id.*

The Supreme Court in *Thornburg* developed a three-part test that a minority group must meet to establish a vote dilution claim under § 2. That test requires: (1) that a minority group be sufficiently large and geographically compact to constitute a majority in a single member district; (2) that the minority group also be politically cohesive; and (3) that bloc voting by the white majority, in the absence of special circumstances, usually defeats the minority's preferred candidate. *Id.* at 50–51, 106 S.Ct. at 2766. Upon reviewing the numerous maps, tables, charts and affidavits submitted by the parties, the New York State Legislative Task Force Submission to the Department of Justice, reports and affidavits of experts and other witnesses for the parties and assorted other evidence, we hold that plaintiffs have failed to prove the 1992 plan reapportioning the Assembly, as enacted by the Legislature and Governor in Chapters 76, 77 and 78 (1992), violates § 2 of the Voting Rights Act.

We note first that a state's redistricting law is ordinarily accorded deference as a constitutionally compliant enactment. *See Clements v. Fashing*, 457 U.S. 957, 962–63, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982). This deference, at least with respect to the three counties of Kings, New York and Bronx, which are subject to continuing review by the Department of Justice under § 5 of the Voting Rights Act, is amplified by the Department's intervening preclearance of the Assembly plan, with the exception of two districts in northern Manhattan, A.D. 71 and A.D. 72. In light of plaintiffs' heavy burden we find plaintiffs have failed to establish a violation of § 2 under the three prong analysis set forth in *Thornburg*.

■ We are not persuaded that the alleged "packing" of minority districts effected in the Assembly plan rises to the level of a Voting Rights Act infirmity. Plaintiffs argue the plan creates too few minority control districts because it uses too high a percentage of minority population to create an effective control district. For instance, the Assembly plan includes 9 districts with black populations greater than the 65% rule of thumb adopted in *United Jewish Orgs., Inc. v. Carey,* 430 U.S. 144, 162–65, 97 S.Ct. 996, 1008–10, 51 L.Ed.2d 229 (1977). The higher minority concentrations are needed, defendants claim, principally due to various lower voter turnout, registration and voting age population figures among minorities as compared to the non-Hispanic white community, and due to the geographic concentrations of minorities in certain areas.

We are unpersuaded that these districts are unlawfully packed. Plaintiffs have not convinced us that the state legislature's decision to heighten the minority population in certain Assembly districts is a pretext for an unworthy goal. Moreover, under some circumstances, the use of a lower population threshold for minority districts may lead to ineffective minority control districts. This choice is a matter of judgment, and we cannot say on this record that the legislature exercised its judgment unlawfully.

This result is not inconsistent with the Attorney General's decision preclearing all Assembly districts in the new plan except A.D. 71 and A.D. 72 under § 5 of the Voting Rights Act. As to those two districts, the Justice Department's withholding of preclearance will require that they be redrawn. Accordingly, we have no need to make an independent determination whether they violate § 2.

■ Plaintiffs also claim § 2 of the Act requires that in areas where minorities are not sufficiently large and compact to constitute a majority of voters in a single district, they should be consolidated into a single district to maximize their ability to influence elections. Whether influence districts are required under the Voting Rights Act has not been expressly determined by the Supreme Court. *See Thornburg,* 478 U.S. at 46–47 n. 12, 106 S.Ct. at 2764 n. 12; *Chisom,* —— U.S. at —— n. 24, 111 S.Ct. at 2365 n. 24. *Compare Armour,* 775 F.Supp. at 1052 (influences districts required under Section 2) *with Turner v. Arkansas,* 784 F.Supp. 553, 571 (E.D.Ark. 1991) (influence districts not required), *aff'd,* —— U.S. ——, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992); *Hastert v. State Bd. of Education,* 777 F.Supp. 634 (N.D.Ill.1991) (same). We need not answer this question because even assuming the Act requires that influence districts be provided, plaintiffs failed to sustain their burden of proof on this issue. Evidence regarding the cohesiveness of minority voting and the racial polarization of white majority voters in the areas of New York where an influence district claim might apply is lacking in plaintiffs' proof. In the event influence districts are necessary, *Thornburg's* requirements of racial polarization and minority cohesiveness must be met to sustain such a challenge.

IV

■ Finally, we turn to the question of how today's ruling, when considered in conjunction with the myriad other activities that have transpired during the past week, affects the Senate apportionment plan. As noted in earlier decisions and orders, no party before this Court has challenged the state's 1992 Senate apportionment plan. The *Scaringe* case only challenges the 1983 Senate districts in light of the 1990 census, and raises no substantive challenge to the 1992 districts. *Scaringe* was undoubtedly brought in anticipation of the 1992 Senate plan being declared invalid, so as to prevent the state from administering the coming election under the 1983 apportionment plan. As noted above, we granted plaintiff's motion for summary judgment in *Scaringe* thereby declaring the 1983 Senate districts invalid in light of the 1990 census.

At first glance, the recent decision by the New York State Court of Appeals would seem to moot the *Scaringe* action because

the 1992 Senate apportionment plan has now been adjudicated valid on its merits by New York's highest court, as well as having been precleared by the Attorney General. Nonetheless, the case is not moot. Administration of an election under the 1992 Senate apportionment plan is foreclosed by the fact that the Attorney General refused to preclear the 1992 Assembly plan, thereby rendering the Assembly plan invalid. Because Article Three, Section 5 of the New York Constitution requires that valid Senate and Assembly plans must be enacted in the same legislation, any continuing invalidity of the Assembly apportionment plan necessarily invalidates the Senate plan. *In re Orans,* 15 N.Y.2d 339, 351, 258 N.Y.S.2d 825, 206 N.E.2d 854, *app. dismissed,* 382 U.S. 10, 86 S.Ct. 75, 15 L.Ed.2d 13 (1965). Thus the Attorney General's rejection of the Assembly plan therefore invalidates the Senate plan, even though the Attorney General (and the New York Court of Appeals) approved the Senate plan on its merits. New York State is currently without a valid Assembly or Senate apportionment plan for the 1992 election.

■ Although we granted plaintiff's motion for summary judgment in *Scaringe,* in an order dated June 24, 1992, we retained jurisdiction so as to fashion an appropriate remedy. Given the imminence of the 1992 election season and the absence of a valid Senate or Assembly apportionment plan to govern the elections, an appropriate remedy in this case is obviously the issuance of an apportionment plan to govern the upcoming elections. With respect to the Senate election, implementation of such a plan is not difficult. We may simply order the identical Senate apportionment plan precleared by the Attorney General be utilized for the 1992 election season. The plan has survived all challenges mounted against it and would be valid but for the state constitutional provision that requires its enactment in the same bill as a valid Assembly plan. By ordering the election to occur in accordance with the state's Senate plan, we adhere to our obligation to "follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans

proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution...." *White v. Weiser,* 412 U.S. at 795, 93 S.Ct. at 2354; *accord Upham v. Seamon,* 456 U.S. 37, 41–43, 102 S.Ct. 1518, 1522, 71 L.Ed.2d 725 *reh'g denied,* 456 U.S. 938, 102 S.Ct. 2001, 72 L.Ed.2d 461 (1982).

■ Intervenor-defendants Ohrenstein and Masiello have forcefully argued that this Court is without jurisdiction to order implementation of a new apportionment plan in *Scaringe.* The Senate defendants in *Scaringe* later made a similar motion on July 1, 1992 claiming the Court is without the power to fashion a new Senate plan. Although intervenor-defendants have since withdrawn their argument, we consider these challenges to our jurisdiction serious enough to be deserving of an explanation of our action in the *Scaringe* case. Intervenor-defendants' contended that plaintiff requested such relief only "in the event the Attorney General objects to ... [the] Senate [plan]...." Intervenor-defendants urged that since the condition-precedent to relief under this clause, *to wit,* an objection by the Attorney General, did not occur, the Court is not empowered to direct the use of an apportionment plan with respect to the Senate.

Yet, the remedy we fashion today is not issued pursuant to the clause of the complaint upon which these intervenor-defendants exclusively relied. Rather, relief is ordered pursuant to the clause that requests the Court to "[g]rant such other and further relief as the Court deems just and proper under the circumstances," a clause that we believe allows us to act without regard to the Attorney General's preclearance of the Senate plan. Consequently, the complaint invokes this Court's jurisdiction to afford a remedy in this case, and we do so *for the sake of ensuring a fair, timely election in New York State this Fall.*

## CONCLUSION

After reviewing the proof following the summary trial of the *F.A.I.R.* action, the Court concludes that the challenges raised

in plaintiffs' complaint to New York's Assembly redistricting plan are without merit. No constitutional or statutory violation is found by this Court except for the Attorney General's refusal to preclear A.D. 71 and A.D. 72 under the Voting Rights Act. With respect to those two districts, we have directed the Special Master to draw new district lines for them, and for such contiguous districts as may thereby be affected, to bring those districts into compliance with the Voting Rights Act. With respect to the remaining districts in the Assembly plan and the entire Senate plan, we defer to the legislature's plan and adopt its apportionment of those districts. *See Upham*, 456 U.S. at 40–41, 102 S.Ct. at 1521. We will implement the Special Master's plan, as accepted and approved by this Court, as the apportionment of New York's Senate and Assembly districts, unless the legislature has in place a precleared plan before July 9, 1992.