Robert **HULME, the Madison County Republican Central Committee, Homer Henke, Steven Stobbs, William Meyer, Eugene Frizzo, and Judy Kuhn, Plaintiffs,**

v.

**MADISON COUNTY, a body politic Corporate, and Mark A. Von Nida, Clerk of the County of Madison, all in their official capacity, Defendants.**

No. 01–CV–0456–DRH.

United States District Court, S.D. Illinois.

Nov. 28, 2001.

J. Thomas Long, Godfrey, IL, for plaintiffs.

Alphonse J. Pranaitis, Jr., Donald L. Smith, Hoagland, Fitzgerald, Alton, IL, for defendants.

### MEMORANDUM AND ORDER

HERNDON, District Judge.

## I. Introduction

As happens with each new decade, the year 2000 and its nationwide census brought about the need to reapportion the political subdivisions in the State of Illinois. Reapportionment induces a great deal of tension as political parties try to hold onto seats they have acquired in the preceding decade. Individual officeholders

hope to retain a constituency that will re-elect them. Political considerations naturally abound. Although "politics" is a dirty word in some quarters, the presence of politics in reapportionment need not constitute a negative nor unacceptable factor. For instance, it may be politically expedient, and in the best interest of the electorate, to maintain the integrity of a district that is primarily minority in make-up. Likewise, it is common sense that an incumbent would not wish to be placed in a district that would pit him against another incumbent. Also, a representative's familiarity with a district is likely to benefit the citizens residing in that district. Ideally, the only politics that should ultimately prevail is that which assures that elected representatives act in the best interest of all of the people. Democrats, it must be remembered, are not elected to represent Democrats exclusively any more than Republicans are elected to represent Republicans exclusively. The gathering of ideas for the process of reapportionment should be an inclusive process, not an exclusive process. Some degree of bipartisanship is ideal. At the very least, as the Court will explore, the reapportionment process should be guided by the mandates of the Equal Protection Clause of the Fourteenth Amendment and the Illinois statute which sets forth the specific requirements for reapportionment.

This brings us to the 2001 County Board redistricting process in Madison County, Illinois. That process demonstrated the worst of politics. The process fell so far short of representing the electorate that it seems the citizens of Madison County were not so much as an afterthought. Rather than the collective work of five committee members or twenty nine board members, the 2001 apportionment plan was the creation of one Board member, Wayne Bridgewater, the Chair of the assigned Committee, influenced by another Board member, who was not on the Committee. Far from some semblance of bipartisanship, the reapportionment process in Madison County was characterized by threats, coercion, bullying, and a skewed view of the law. The resulting County Board districts, and the map which exemplifies them, contravene the United States Constitution and certain statutes of the State of Illinois.

As a result, Plaintiffs filed a three-count Complaint on July 13, 2001 against Madison County, the Clerk of Madison County, Mark Von Nida, the Illinois State Board of Elections and several of its members (Doc. 1).[1] On August 22, 2001, upon motion by the Plaintiffs, the Court dismissed Count III of the original complaint and granted Plaintiffs leave to file an amended complaint (Doc. 18). In Count I of the First Amended Complaint, Plaintiffs allege that the reapportionment plan adopted by the Madison County Board on June 20, 2001 violates the Equal Protection Clause of the Fourteenth Amendment because it is not consistent with the required principle of "one person, one vote" (Doc. 19). In Count II, Plaintiffs allege that the reapportionment plan violates the Illinois Counties Code, 55 ILCS 5/2–3003, which sets forth the specific guidelines a county board must follow in adopting an apportionment plan (Doc. 19). Federal jurisdiction is properly grounded in 28 U.S.C. § 1343(3)[2] and in this Court's supplemen-

1. On August 29, 2001, the Court dismissed Plaintiffs' Complaint against the Illinois State Board of Elections and its members, finding that the suit is barred by the Eleventh Amendment (Doc. 23).

2. 28 U.S.C. § 1343(3) provides:
The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
(3) To redress the deprivation, under color of any State law, statute, ordinance, regula-

tal jurisdiction, pursuant to 28 U.S.C. § 1367.

## II. *Procedural Vehicle of Resolution*

On November 2, 2001, the parties followed a curious path in litigating this case and filed cross motions for summary judgment or, in the alternative, motions for judgment on partial findings pursuant to FEDERAL RULE OF CIVIL PROCEDURE 52(c) (Docs. 30 & 35). On November 6, 2001, the Court held a hearing on the motions (Doc. 41).

### A. *Summary Judgment Standard*

Under FEDERAL RULE OF CIVIL PROCEDURE 56, summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Because the Court finds that there are clearly genuine issues of material fact that would preclude summary judgment for either party, the Court will proceed under Rule 52(c).

### B. *Rule 52(c) Standard*

■ FEDERAL RULE OF CIVIL PROCEDURE 52(c) provides:

**(c) Judgment on Partial Findings.** If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue .... Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

tion, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of

The Notes of the Advisory Committee for the 1991 Amendment to Rule 52 state, in relevant part:

Subdivision (c) is added.... It authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence. The new subdivision replaces part of Rule 41(b), which formerly authorized a dismissal at the close of the plaintiff's case if the plaintiff had failed to carry an essential burden of proof.

Therefore, the Court will apply the standard previously articulated for an involuntary dismissal under Rule 41(b). "[T]he court must take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as the court believes it is entitled to receive." *Sanders v. Gen. Servs. Admin.*, 707 F.2d 969, 971 (7th Cir. 1983) (discussing Rule 41(b)). Pursuant to FEDERAL RULE OF CIVIL PROCEDURE 52(c) this opinion shall serve as the Court's findings of fact and conclusions of law.

## III. *Analysis*

### A. *Count I—Equal Protection*

Defendants argue that because the apportionment plan adopted by the Madison County Board has a total population deviation under 10%, it is presumptively valid and, therefore, Plaintiffs cannot prove a violation of Equal Protection. Plaintiffs, however, contend that although the total population deviation of the apportionment plan adopted by the Board is less than 10%, it violates the Equal Protection Clause because the process by which the plan was adopted was tainted with arbitrariness and discrimination.

Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; ....

In *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the United States Supreme Court held that "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable." *Id.* at 577, 84 S.Ct. 1362. Extending its holding in *Reynolds* to local governmental units, the Supreme Court in *Avery v. Midland County, Texas,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), held that the Equal Protection Clause "permits no substantial variation from equal population in drawing districts for units of local governments having general governmental powers over the entire geographic area served by the body." *Id.* at 484–85, 88 S.Ct. 1114. In *Roman v. Sincock,* 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964), decided the same day as *Reynolds,* the Supreme Court rejected the district court's attempt to establish a fixed mathematical formula for evaluating the constitutional validity of an apportionment plan. The *Roman* Court stated:

> [T]he problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state apportionment scheme under the Equal Protection Clause. Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination.

*Id.* at 710, 84 S.Ct. 1449. Further, in *Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), the Supreme Court rejected the argument that there is a precise mathematical benchmark below which population variances are automatically considered *de minimis.* The *Kirkpatrick* Court reasoned:

> [T]he 'as nearly as practicable' approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case. The extent to which equality may practicably be achieved may differ from State to State and from district to district. Since 'equal representation for equal numbers of people (is) the fundamental goal for the House of Representatives,' the 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality. Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small.

*Id.* at 530–31, 89 S.Ct. 1225 (citations omitted). The *Kirkpatrick* Court further explained: "[w]e can see no nonarbitrary way to pick a cutoff point at which population variances suddenly become de minimis. Moreover, to consider a certain range of variances de minimis would encourage legislators to strive for the range rather than for equality as nearly as practicable." *Id.* at 531, 89 S.Ct. 1225.

Acknowledging that "mathematical exactness or precision is hardly a workable constitutional requirement," *Reynolds,* 377 U.S. at 577, 84 S.Ct. 1362, however, the Supreme Court has since held that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Gaffney v. Cummings,* 412 U.S. 735, 745, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). Further, the Supreme Court in *White v. Re-*

*gester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), held that state reapportionment statutes are not subject to the same strict standards applicable to reapportionment of Congressional seats. *Id.* at 764, 93 S.Ct. 2332.

The Supreme Court has come to recognize a general benchmark for determining whether an apportionment plan's population deviation is *de minimis.* In *Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), the Supreme Court stated that "[o]ur decisions have established, *as a general matter,* that an apportionment plan with a maximum population deviation under 10% falls within [the] category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State." *Id.* at 842–43, 103 S.Ct. 2690 (emphasis added).

 The language in *Brown* does not establish, as Defendants argue, that an apportionment plan with a maximum population deviation under 10% is immune from Constitutional attack. Under *Reynolds* and its progeny it is clear that an apportionment plan with a total population deviation of greater than 10% automatically establishes a prima facie violation of the Fourteenth Amendment that therefore requires justification by the State. *Id.* It is also clear that a total population deviation of less than 10% enjoys a presumption of validity and will not, by itself, support a claim of invidious discrimination. *Gaffney,* 412 U.S. at 745, 93 S.Ct. 2321. This Court, however, finds that a plaintiff may prove a prima facie violation of the Fourteenth

Amendment by an apportionment plan with a population deviation of less than 10% if he can "produce further evidence to show that the apportionment process had a 'taint of arbitrariness or discrimination.'" *Daly v. Hunt,* 93 F.3d 1212, 1220 (4th Cir.1996) (quoting *Roman,* 377 U.S. at 710, 84 S.Ct. 1449). If shown, the burden then shifts to the legislative body to show that the plan's population disparity is justified by a rational state (governmental) policy. *Brown,* 462 U.S. at 842–43, 103 S.Ct. 2690. "In other words, for deviations below 10%, the state is entitled to a presumption that the apportionment plan was the result of an 'honest and good faith effort to construct districts ... as nearly of equal population as practicable.' *Reynolds,* 377 U.S. at 577, 84 S.Ct. at 1390. However, this is a rebuttable presumption." *Daly,* 93 F.3d at 1220.

It is undisputed that the 2001 apportionment plan adopted by the Madison County Board has a total population deviation of 9.3%. (Doc. 33, Stipulation # 4). The Court, therefore, must determine whether Plaintiffs have shown that the 2001 apportionment process of the Madison County Board was tainted by "arbitrariness or discrimination." In doing this, the Court takes an unbiased view of all the evidence and accords it such weight as it is entitled to receive. *Sanders,* 707 F.2d at 971. The Court notes that it was not presented with any live testimony in this case. Rather, the parties chose to submit this case entirely upon stipulations and documents.[3] The Court recognizes the difficulty in assessing the credibility of testimony submitted by affidavit and deposition. Weighing

---

**3.** The evidence before the Court includes: the parties' "Stipulations of Fact" (Doc. 33), the deposition of Alan J. Dunston; the deposition of Dr. Paul Burger; the affidavits of Wayne Bridgewater (Doc. 38), Dennis Dubbelde (Doc. 32), James Fitzgerald (Doc. 38), Gene Frizzo (Doc. 32), Homer Henke (Doc. 32),

Robert Hulme (Doc. 32), Bill Meyer (Doc. 32), Jack Minner (Doc. 38), James K. Monday (Doc. 37), Stephen A. Stobbs (Doc. 32), and Larry Trucano (Doc. 38); and the documents and maps contained in the parties' "Joint Exhibit 1" which have been Bates stamped 0000001–0000283.

all the testimony in light of its consistency with the undisputed facts and the totality of the circumstances of this case, however, the Court finds the following facts to be true.

There are 29 members of the Madison County Board: 24 Democrats and 5 Republicans. (Doc. 33, Stipulation # 6). In December 2000, the Madison County Board's Legislative Committee was reorganized, and the former Committee Chairman, Alan Dunston, as well as other former members, Dennis Dubblede and Don Garrett, were removed from the Committee. (Dunston Depo., p. 8, lines 3–24). Thereafter, Wayne Bridgewater, Mark Burris, Ed Hagnauer, Homer Henke, and Sharon Perjak were appointed to serve on the Legislative Committee for the purposes of constructing an apportionment plan based upon the 2000 census. (Doc. 33, Stipulation # 5). Wayne Bridgewater was the Chairman of the Legislative Committee. (Doc. 33, Stipulation # 6). Homer Henke was the only Republican Committee member. (Doc. 33, Stipulation # 6). The Legislative Committee met at least eleven times between January 17, 2001 and June 6, 2001. (Exhibits 0000001, 0000032, 0000034, 0000036, 0000047, 0000059, 0000085, 0000091, 0000103, 0000125, and 0000127). During the March 21, 2001 County Board meeting, James Monday, the Director of Administration for Madison County Government, informed the Board that, according to the 2000 census, the population of Madison County results in 8,929 persons per district when divided equally among the 29 county board districts. (Exhibit 0000029; Doc. 33, Stipulation # 2). Therefore, the ideal population per district is 8,929 persons.

During the April 10, 2001 meeting of the Legislative Committee, Madison County Assistant State's Attorney, John McGuire, informed the Committee of the legal requirements of the county board redistricting process. (Exhibit 0000034). Specifically, McGuire told the Committee, *inter alia,* that each district must be "as nearly equal in population as possible," composed of contiguous territory, and as nearly compact as possible. (Exhibit 0000034). McGuire later presented this information in writing to the full Board. (Exhibit 0000035A–D). In the letter, McGuire specifically advised the Board that:

There is no fixed percentage that separates a *de minimis* maximum deviation from an unconstitutional maximum deviation. However, a useful guideline has developed throughout the federal Court system that an apportionment plan with a maximum deviation of less than 10% is likely to be found to be a *de minimis* departure from the One Person, One Vote rule.

However, there is no guarantee that the usually reliable 10% benchmark will ensure that a reapportionment plan will pass constitutional muster.... [I]n *Sutton v. Dunne,* ... the Seventh Circuit Court of Appeals found a deviation of 4.22% ... to violate the One Person, One Vote rule. This decision may well have been the result of the peculiar circumstances of that case....

Nevertheless, you should not ignore *Sutton....*

Accordingly, I would recommend that the County Board make every effort to minimize the maximum deviation in its reapportionment plan. The 10% figure is a good guideline, but it does not automatically insulate a reapportionment plan from attack. All other things being equal, a plan with a maximum deviation of 5.9% will withstand a constitutional challenge more easily than a plan with a maximum deviation of 9.5%.

(Exhibit 0000035–C).

The Committee generated its first working map on April 30, 2001. (Exhibits

0000047–0000058, 0000260). During the next several Committee meetings, the Committee developed numerous proposals for modifying the existing County Board District boundaries "to bring the population deviation to *within their target figure of less than ten percent total deviation.*" (Doc. 37, Monday Affidavit, p. 4 (emphasis added)). The meetings were attended by Committee members, other current Board members, past candidates for County Board seats, political party representatives, the media, and other interested citizens. (Doc. 37, Monday Affidavit, p. 4). Several individuals submitted either in writing or orally their suggestions for the reapportionment plan. (Doc. 37, Monday Affidavit, p. 4). Clearly, the Committee had at its disposal advanced technological equipment. During each meeting, James Monday would input the suggestions into a computer, utilizing ArcView software, to generate an immediate visual representation of the data to analyze the resulting deviations in population among the proposed districts. (Doc. 37, Monday Affidavit, p. 4). Board members Everett Loy and Nick Hamilos and each of the five Committee members submitted written proposals. (Doc. 37, Monday Affidavit, p. 4). At times, some Committee members attempted to fashion a bipartisan map. One such member was Democrat Mark Burris.

The Court gleans from all of the facts presented that the real issue for a final map came down to whether to keep Godfrey Township whole with two board districts, thereby reducing Alton Township to three board districts from four, and creating a new district in the eastern part of the county. During the April 30th Committee meeting, Burris presented a plan which accomplished keeping Godfrey Township whole, but took a district away from Alton Township. (Doc. 32, Henke Affidavit, p. 4; Stobbs Affidavit, p. 5). Upon submission of this proposal, Chairman Bridgewater specifically asked Board member Everett Loy, a Democrat from Alton but not a member of the Committee, what he thought about the Burris plan. (Doc. 32, Stobbs Affidavit, p. 6). Loy complained about the loss of a district in Alton. (Doc. 32, Stobbs Affidavit, p. 6). After the meeting, Loy was seen speaking emotionally with Burris. (Doc. 32, Stobbs Affidavit, p. 6). The Chairman's own comment on the Burris plan was that it was just an idea and he could see going into Godfrey to cannibalize Stobbs' (a Republican) district, (Doc. 32, Stobbs Affidavit, p. 6). Bridgewater concedes he made this statement, though he unsuccessfully attempts to cast it in a neutral light. (Doc. 38, Bridgewater Affidavit, p. 5). Putting these words into action, Loy thereafter submitted a proposal for the Alton and Godfrey area which gave Alton four Board districts, with Godfrey Township divided across two of the Alton districts. (Exhibit 0000087). Interestingly, there is little appreciable difference between Loy's proposed plan for districts 7, 8, 9, and 10 (the Alton districts) and the plan ultimately adopted by the Board. (Exhibits 0000087 and 0000216–0000224).

On May 30, 2001, Chairman Bridgewater presented a complete plan to the Committee which had a maximum population deviation of 9.04%. (Exhibits 0000103 and 0000106–0000114). Also during this meeting, Henke put forth a partial proposal for 5 of the 29 districts. (Exhibit 0000122). At the final Committee meeting on June 6, 2001, Henke presented a completed apportionment plan which he contends had a total population deviation of 8%.[4] (Exhibits

---

**4.** Although contrary to the Committee minutes, Henke's contention that his June 6th map had a population deviation of 8% has a reliable basis when considered in the context of his entire proposal.

000127–0000135; Doc. 32, Henke Affidavit, p. 6–7). Upon submission of Henke's plan, Chairman Bridgewater called a ten minute recess to allow him to retrieve his proposed apportionment plan from his car. (Exhibit 0000127). Bridgewater's June 6th proposed plan, which was different from the plan he proposed at the May 30th meeting, had a total population deviation of 9.3%. (Exhibits 0000106–0000114 and 0000136–0000143). In a 4 to 1 vote, the Committee voted to adopt Bridgewater's plan as its recommendation to the full Board, with Henke as the lone dissenter. (Exhibit 0000127). When Burris was asked after this meeting why he ultimately supported the Bridgewater plan, he remarked that there was nothing he could do about it because he was under a tremendous amount of pressure. (Doc. 32, Frizzo Affidavit, p. 3).

During the June 20, 2001 Madison County Board meeting, the Committee presented its recommended plan. (Exhibit 0000216). Also during this meeting, Henke submitted his proposed plan, which differed only slightly from the plan he presented at the June 6th Committee meeting. (Exhibits 0000128 and 0000225–0000231). The apportionment plan submitted by Henke to the full Board had a population deviation of 8.51%. (Exhibit 0000225). In a 21 to 7 vote, the Madison County Board adopted the apportionment plan recommended by the Legislative Committee. (Exhibit 0000237).

 The apportionment plan adopted by the Madison County Board splits Godfrey Township across three different districts. (Exhibit 0000272). Godfrey Township could have supported two districts from that township alone. (Dunston Depo., p. 53, lines 9–11; Exhibit 0000268).

The plan adopted by the Board also divides 13 precincts (Exhibits 0000136–0000143), while the two plans submitted by Henke each only divided 2 precincts.[5] (Exhibits 0000128–0000135 and 0000225–0000231). Further, the apportionment plan adopted by the Board places two incumbent Republican Board members in the same district. (Doc. 32, Meyer Affidavit, p. 2–3; Exhibit 0000272).

The atmosphere surrounding this apportionment process is evidenced by certain comments made by the Committee Chairman, Wayne Bridgewater, and County Board member, Everett Loy. During one of the preliminary Committee meetings, Chairman Bridgewater stated: "[the apportionment process] is going to be partisan; I have no problem putting two Republicans together if that is what it takes." (Doc. 32, Stobbs Affidavit, p. 2; Dunston Depo., p. 63, lines 12–15, 22–24; Doc. 32, Hulme Affidavit, p. 2). At another Committee meeting, Chairman Bridgewater approached Board member Alan Dunston and stated: "I hear you're saying bad things about me, mother f——r. I'll tell you right now mother f——r, if you open your mother f----- mouth, I'm gonna have your mother f----- ass moved out by the mother f-----g police." (Dunston Depo., p. 69, lines 8–13). Chairman Bridgewater also threatened a newspaper photographer, who was attending one of the Committee meetings, by saying: "get your mother f----- ass out of here or I'm gonna have your f----- ass taken out." (Dunston Depo., p. 70, Lines 1, 11–18). In a letter dated April 16, 2001, Board member Bill Meyer notified County Board Chairman, Rudy Papa, of Bridgewater's conduct and requested that he consider asking for

**5.** The Court acknowledges that evidence of a "better" plan is not by itself sufficient to establish a violation of the one person, one vote principle, *Gaffney,* 412 U.S. at 740–41, 93 S.Ct. 2321, but uses the alternative plans submitted as evidence of the arbitrariness employed in the Madison County redistricting process.

Bridgewater's resignation from the Legislative Committee. (Doc. 32, Meyer Affidavit, p. 2, Exhibit A). Bridgewater, however, remained on the Committee as the Chairman. In a Committee meeting sometime thereafter, Chairman Bridgewater approached Henke and said: "I know you wrote the f-----g letter for Meyer, you prick." (Doc. 32, Henke Affidavit, p. 3).

In early April, Everett Loy told Board member Steven Stobbs and others during a meeting that the redistricting process was going to be partisan, that "we can turn this map anyway we want," and that Godfrey cannot have two districts and Alton only three or that would be the "tail wagging the dog." (Doc. 32, Stobbs Affidavit, p. 7). Thereafter, during the April 19th Committee meeting, Loy spoke out from the gallery and told the Committee to take a Godfrey precinct or two and put it in Alton so that Alton can keep all of its Democrat members of the County Board. (Doc. 32, Hulme Affidavit, p. 2). When Henke approached Chairman Bridgewater with his objections to the plan Loy proposed at the May 16th Committee meeting, Bridgewater told him that: "We are going to shove it [the map] up your f----- ass and you are going to like it, and I'll f—— any Republican I can." (Doc. 32, Henke Affidavit, p. 4; Frizzo Affidavit, p. 3). Further, Bridgewater concedes that prior to the June 1, 2001 meeting he approached Dunston and said, "Alan, I am not going to take any 's-t' from you tonight, and you need to act like a gentleman tonight in expressing your views." (Doc. 38, Bridgewater Affidavit, p. 4). During the June 20th County Board meeting, after the Board voted to adopt the Bridgewater plan, Chairman Bridgewater tore up the map proposed by Henke. (Doc. 32, Dubbelde Affidavit, p. 1).

 Drawing reasonable inferences from the facts outlined above, the Court is convinced that the 2001 apportionment process of the Madison County Board was unquestionably tainted with arbitrariness and discrimination. The apportionment process pursued in Madison County throughout the first half of 2001 was designed specifically to satisfy the political agenda of Wayne Bridgewater, the Chairman of the Legislative Committee. His primary objective was to construct a map with a population deviation within the "target" of less than 10%, regardless of the practicality of reaching a lower percentage of population deviation. He clearly pursued, and ultimately accomplished, his intent to maintain four districts for Alton Township, even though population shifts did not justify it. Bridgewater's coincidental goal was to create districts that would not simply disadvantage Republican members of the Board, but "cannibalize" their districts to the greatest extent possible. To accomplish these ends, the plan proposed by Bridgewater and adopted by the Board unnecessarily divides Godfrey Township and Hamel Township, thereby giving four districts to Alton Township and pitting two Republican incumbents against each other. Bridgewater achieved his goal, in large part, through his threatening and coercive actions against other Board members. His behavior was not only boorish, but it clearly demonstrates the bad faith under which the Madison County Board districts were apportioned. Had he not pursued this agenda, or had the majority of the Board not acquiesced in this reapportionment plan, the state of technology readily available to the Board would have allowed it, with great practicability, to come much closer to an equal population in each district. The apportionment process described above, therefore, demonstrates a complete disregard for the Constitutional mandate that a legislative body make "an honest and good faith effort to construct districts ... as nearly of equal

population as practicable." *Reynolds,* 377 U.S. at 577, 84 S.Ct. 1362.

Because the Court finds that Plaintiffs have established a prima facie case of discrimination, Defendants must justify the population disparity. The Court must decide whether the "plan 'may reasonably be said to advance [the] rational state policy' " advanced by the Defendants. *Brown,* 462 U.S. at 843, 103 S.Ct. 2690 (quoting *Mahan v. Howell,* 410 U.S. 315, 328, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973)). In this case, however, Defendants have not offered *any* state (governmental) policy to justify the plan's population disparity. Rather, Defendants have consistently rested upon their contention that a plan with a population deviation of less than 10% is presumptively valid and therefore requires no justification. Even when pressed during oral argument, counsel for Defendants conceded that the presumption of validity is rebuttable but was still unable to articulate any justification for the plan that was adopted.

The Court, therefore, finds that the apportionment plan adopted by the Madison County Board violates the Equal Protection Clause of the Fourteenth Amendment.

## B. *Count II—Illinois Counties Code § 5/2–3003(1)*

▮ Under Count II, Plaintiffs allege that the 2001 apportionment plan adopted by the Board violates § 5/2–3003(1) of the Illinois Counties Code. 55 ILCS 5/2–3003(1) provides:

Apportionment plan. (1) If the county board determines that members shall be elected by districts, it shall develop an apportionment plan and specify the number of districts and the number of county board members to be elected from each district. Each such district:

a. Shall be equal in population to each other district;

b. Shall be comprised of contiguous territory, as nearly compact as practicable; and

c. May divide townships or municipalities only when necessary to conform to the population requirement of paragraph a. of this Section.

d. Shall be created in such a manner so that no precinct shall be divided between 2 or more districts, insofar as is practicable.

Plaintiffs first argue that the apportionment plan violates § 5/2–3003 because the Board utilized the wrong standard in adopting their enabling resolution. The preamble to the Board's enabling resolution provides, in relevant part:

**WHEREAS,** under the provisions of Division 3 of the Counties Code (55 ILCS 5/23001 [sic] et seq.) the Madison County Board is required to adopt an Apportionment Plan by July 1, 2001 that determines the location of County Board District boundaries so that each district is substantially equal in population according to the Federal Decennial Census; . . . .

(Exhibit 0000216). Plaintiffs argue that because this preamble requires that each district shall be "substantially equal" rather than "shall be equal," the Board did not pass a valid resolution and that Madison County stands today without any enabling legislation for the adoption of the County Board redistricting plan. The Court does not agree.

▮ "Under Illinois law, a preamble 'is not a part of the Act itself and has no substantive legal force.' " *Atkins v. Deere & Co.,* 177 Ill.2d 222, 228, 226 Ill. Dec. 239, 685 N.E.2d 342 (1997) (quoting *Lieber v. Bd. of Trustees of S. Illinois Univ.,* 176 Ill.2d 401, 414, 223 Ill.Dec. 641, 680 N.E.2d 374 (1997)) (citation omitted). Further, a preamble should not be used as a means of invalidating an ordinance. *Tri-*

*ple A Servs., Inc. v. Rice,* 131 Ill.2d 217, 226–27, 137 Ill.Dec. 53, 545 N.E.2d 706 (1989). The Court, therefore, rejects Plaintiffs' argument that the Board's recitation of the incorrect legal standard in the preamble to its enabling legislation invalidates the Madison County Board's 2001 apportionment plan. Furthermore, the Court's concern as to whether the Board as a whole had appropriate notice of the correct legal standard was satisfied during oral argument by clarification that the entire Board received copies of James Monday's compilation of statutory materials.

Plaintiffs also argue that because § 5/2–3003(1)(a) provides that each district "shall be equal in population," the Counties Code requires a more restrictive standard than that required by the Equal Protection Clause of the Fourteenth Amendment and the *Reynolds* line of cases, discussed above. Plaintiffs, therefore, urge the Court to interpret § 5/2–3003(1)(a) to require the more exacting standard required for Congressional apportionment as set forth in *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) and its progeny.

In contrast, Defendants argue that § 5/2–3003(1)(a) only requires that each district be *substantially* equal in population to each other district and, therefore, requires the same analysis as the Equal Protection Clause. As noted above, the Supreme Court has extended its holding in *Reynolds* to local governmental units. *Avery,* 390 U.S. at 478–79, 88 S.Ct. 1114. Specifically, the Supreme Court held that the Equal Protection Clause "permits no substantial variation from equal population in drawing districts for units of local governments . . . ." *Id.* at 484–85, 88 S.Ct. 1114. The Illinois Counties Code [6] was enacted one year after the *Avery* opinion.[7] In *Bridgewater v. Hotz,* 51 Ill.2d 103, 281 N.E.2d 317 (1972), the Illinois Supreme Court stated that "[t]he enactment of the County Board Act was made necessary by the decision of the Supreme Court in *Avery* . . . ." *Id.* at 110, 281 N.E.2d 317. Defendants, therefore, argue that § 5/2–3003(1)(a) should be interpreted in light of *Avery* and the *Reynolds* line of cases.

"The cardinal rule of statutory construction, to which all other cannons and rules are subordinate, is to ascertain and give effect to the true intent and meaning of the legislature." *People ex rel. Hanrahan v. White,* 52 Ill.2d 70, 73, 285 N.E.2d 129 (1972). "In determining the legislative intent, a court should first consider the statutory language. This is the best means of expounding the legislative intent. Where the statutory language is clear, it will be given effect without resort to other aids for construction." *People v. Hickman,* 163 Ill.2d 250, 261, 206 Ill.Dec.

---

6. Formerly Ill.Rev.Stat.1969, Ch. 34, Par. 831 et seq., now 55 ILCS 5/2–3001 et seq.

7. As enacted, Chapter 34, Paragraph 833 (now 55 ILCS 5/2–3003) provided, in relevant part, that:

(1) If the county board determines that members shall be elected by districts, it shall develop an apportionment plan and specify the number of districts and the number of county board members to be elected from each district. Each such district:

 a. Shall be equal in population to each other district;

 b. Shall be comprised of contiguous territory, as nearly compact as practicable; and

 c. May divide townships or municipalities only when necessary to conform to the population requirement of paragraph a. of this Section.

Later amendments to the statute added what is now paragraph (2) of section 5/2–3003 and added subparagraph (d) to paragraph (1) which provides:

 d. Shall be created in such a manner so that no precinct shall be divided between 2 or more districts, insofar as is practicable.

94, 644 N.E.2d 1147 (1994). If the language is ambiguous, and "[w]hen ... there is no controlling precedent, the history, existing circumstances and contemporaneous conditions of the legislation are invaluable in ascertaining that intent." *Hanrahan*, 52 Ill.2d at 73, 285 N.E.2d 129; *Hickman*, 163 Ill.2d at 261, 206 Ill.Dec. 94, 644 N.E.2d 1147.

The Illinois Counties Code plainly requires that each district "shall be equal in population to each other district." 55 ILCS 5/2–3003(1)(a). The Illinois legislature chose this language, even though it was free to adopt a less restrictive standard. The legislature could have tracked the language of the Supreme Court's decision in *Avery* and required that each district "shall be *substantially* equal in population," but it chose otherwise. Even after the adoption of the 1970 Illinois Constitution, which employs the language "substantially equal" in the context of legislative redistricting, the Illinois legislature left unchanged the "shall be equal" language of the Counties Code. Article IV, Section 3 of the Illinois Constitution requires that "Legislative Districts shall be compact, contiguous and substantially equal in population. Representative Districts shall be compact, contiguous, and substantially equal in population." ILL. CONST. art. IV, § 3. The Illinois Counties Code was most recently amended in 1989. Counties Code, P.A. 86–962, Art. 2, § 2–3003 (1989). With this amendment, the Illinois legislature could have changed § 5/2–3003(1)(a) to parallel the requirements for legislative redistricting found in the Illinois Constitution, but, again, it chose otherwise.

The most persuasive indication of the meaning of "shall be equal" is found in the Illinois Supreme Court's interpretation of Article III, Section 3 of the Illinois Constitution, which requires that all elections "shall be free and equal." ILL. CONST. art. III, § 3. Interpreting this language,[8] the Illinois Supreme Court has held that, "[e]lections are equal when the vote of each voter is equal in its influence upon the result to the vote of every other elector—where each ballot is as effective as every other ballot." *Moran v. Bowley*, 347 Ill. 148, 162–63, 179 N.E. 526 (1932).

■ The Court, therefore, finds that the Illinois Counties Code requires more than "substantial" population equality among districts. Section 5/2–3003(1)(a) means what it says—each district "shall be equal in population to each other district." Mathematical precision, of course, is a practical impossibility, unless one ignores the Code's prohibition against township, municipality, and precinct splitting. Therefore, the Counties Code demands that a county board apportion its districts as close to equal in population as practicable. Recent advances in technology have made this apportionment process easier than it ever has been. The Court, therefore, holds that § 5/2–3003(1)(a) requires that the districts shall be as close to equal in population as practicable given the current state of technology.

■ The districts defined by the Madison County 2001 apportionment plan are not as close to equal in population as practicable given the current state of technology. The Legislative Committee was able to construct an apportionment plan that had a maximum population deviation lower

---

**8.** The Illinois Supreme Court was interpreting Article II, Section 18 of the Illinois Constitution of 1870. However, Article II, Section 18 of the 1870 Illinois Constitution was repeated verbatim in Article III, Section 3 of the 1970 Illinois Constitution. ILL. CONST. art. III, § 3. Moreover, the Illinois Supreme Court has since reaffirmed its holding in *Moran*. *Bridgewater v. Hotz*, 51 Ill.2d 103, 112, 281 N.E.2d 317 (1972).

than the plan that the Board ultimately adopted. (Exhibit 0000106). Plaintiffs have also demonstrated that it is practicable to construct an apportionment plan that is closer to equal in population per district. (Exhibit 0000136). Although evidence of a "better" plan is not by itself sufficient to establish a violation of the one person, one vote principle, *Gaffney*, 412 U.S. at 740–41, 93 S.Ct. 2321, these alternative plans certainly demonstrate that the county board districts are not as close to equal in population as practicable.

In addition to equal population per district, § 5/2–3003(1) requires that each district be comprised of contiguous territory, as nearly compact as practicable and that townships, municipalities, or precincts may be divided only when necessary to conform to the equal population requirement. 55 ILCS 5/2–3003(1)(b)–(d). Construing the terms "compact" and "contiguous" together, as applicable to legislative districts, the Illinois Supreme Court has held that the parts of the district "must not only touch each other, but must be closely united, territorially." *People ex rel. Woodyatt v. Thompson,* 155 Ill. 451, 478, 40 N.E. 307 (1895). Perfect compactness is not required. Rather, the districts formed must be "reasonably compact." *People ex rel. Scott v. Grivetti,* 50 Ill.2d 156, 166, 277 N.E.2d 881 (1971). A visual examination of the apportionment map may be sufficient to determine whether the reasonable compactness standard has been met. *Schrage III v. State Bd. of Elections,* 88 Ill.2d 87, 98, 58 Ill.Dec. 451, 430 N.E.2d 483 (1981). The Illinois Supreme Court, however, has noted that the courts do not determine whether a district is as compact as possible; rather, the courts are to determine only whether the legislative body has applied the principle of compactness of territory at all or not at all. *Thompson,* 155 Ill. at 480, 40 N.E. 307. The Court cannot conclude that in the formation of the Madison County Board districts the

requirement of compactness of territory was wholly ignored. This, of course, does not save the Board's apportionment plan— for the requirement of compactness is "subservient to the dominant requirement of population equality," *Scott,* 50 Ill.2d at 166, 277 N.E.2d 881, and, as noted above, the Board's plan fails in this regard.

The Madison County 2001 apportionment plan also disregards the Code's instruction that townships, municipalities, or precincts may be divided only when necessary to conform to the equal population requirement. The adopted apportionment plan divides 13 precincts and all but 11 eleven townships. (Exhibit 0000136–0000143). Defendants have not shown that these divisions were necessary to conform with the equal population requirement. In fact, one of the working plans constructed by the Committee, which had a lower maximum population deviation than the plan adopted, also divided fewer precincts. (Exhibit 000106–000114). Further, the plan proposed by Henke at the June 20th County Board meeting had a lower population deviation than the plan adopted and only divided 2 precincts. (Exhibits 0000225–0000231).

The Court, therefore, finds that the 2001 apportionment plan adopted by the Madison County Board also violates § 5/2–3003(1) of the Illinois Counties Code. Accordingly, the Court grants Plaintiffs' motion for judgment on partial findings and denies Defendants' motion for judgment on partial findings.

### IV. *Conclusion*

The Court **DENIES** Plaintiffs' motion for summary judgment (Doc. 30–1) and Defendants' motion for summary judgment (Doc. 35–1). The Court **GRANTS** Plaintiffs' motion for judgment on partial findings (Doc. 30–2) and **DENIES** Defendants' motion for judgment on partial findings (Doc. 35–2). Because the Court finds that the 2001 apportionment plan adopted by

the Madison County Board on June 20, 2001 violates the Equal Protection Clause of the Fourteenth Amendment and 55 ILCS 5/2–3003, the Court **DECLARES** the 2001 Madison County apportionment plan invalid, unconstitutional, and unenforceable. The Court **ORDERS** the Madison County Board to adopt an apportionment plan that complies with the mandates of the Equal Protection Clause of the Fourteenth Amendment and 55 ILCS 5/2–3003.[9] The Court retains jurisdiction to ensure compliance with this Order. The Court **DIRECTS** the Clerk of the Court to enter judgment accordingly.

**IT IS SO ORDERED.**

---

9. Plaintiffs have requested, as an alternative remedy, that the Court order the County Apportionment Commission to develop an apportionment plan. *See* 55 ILCS 5/2–3004. This Court is without legal authority to do so. 55 ILCS 5/2–3004 provides, in relevant part: "if the county board fails to complete the reapportionment of the county ... the county clerk of that county shall convene the county apportionment commission.... The commission shall submit its apportionment plan by October 1 ... except that the circuit court, for good cause shown, may grant an extension of time, not exceeding a total of 60 days ...."